

CAITLINROSE H. FISHER
cfisher@forsgrenfisher.com
612.474.3310

June 2, 2026

***VIA ECF***

Susan E. Bindler
Clerk of Court
United States Court of Appeals for the Eighth Circuit
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
St. Louis, MO 63102

      Re:    *United States of America v. Tashena Crump,* No. 24-3453

Dear Ms. Bindler:

We write to alert the Court to two pertinent supplemental authorities that post-date oral argument in the above-captioned matter.

First, in *United States v. Wendt*, this Court partially vacated a conviction in a case in which the majority opinion author concluded that the statute of conviction was unconstitutionally vague "as applied to" the defendant. 168 F.4th 1068, 1077 (8th Cir. 2026) (attached as **Exhibit A**). Although the two split on their ultimate conclusions, both the opinion author and the dissent recognized that a federal law may be unconstitutionally vague as applied to the conduct of a particular defendant. *Id.* at 1076; *id.* at 1085 (Kelly, J., dissenting in part).[1] Ms. Crump here similarly raised an as-applied vagueness challenge and, as the majority opinion author concluded was true in *Wendt*, sustaining Ms. Crump's conviction would expand federal criminal liability in a way in which Ms. Crump "lack[ed] fair and definite notice." App't Br. at 41; *see also* Reply Br. at 10–11; *Wendt*, 168 F.4th at 1077.

Second, in *United States v. Agbaje*, this Court reversed a criminal conviction after the district court excluded evidence of an "important" cooperating witness's potential bias at trial. No. 24-2944, --- F.4th ----, 2026 WL 1325138, at *1 (8th Cir. May 13, 2026) (per curiam) (attached as **Exhibit B**). This Court reaffirmed that "[e]vidence tending to show a substantial reason for bias or interest in an important witness is never collateral or irrelevant." *Id.* at *3 (quotation omitted). The non-disclosed evidence here included evidence of bias (racist sentiments) on the part of Brian Williams, a coconspirator whose statements to others about Crump were important to the Government's case. R.Doc. 2351 at 23; *see also* App't Br. at 17–18, 54 & n.14; Reply Br. at 4, 6–7, 22–24, 26–27. As in *Agbaje*, the absence of this bias

---

[1] The concurring judge concluded that the at-issue conduct was not a crime and therefore did not reach the vagueness issue.

Capella Tower // 225 South 6th Street, Suite 1500 // Minneapolis, MN 55402 // 612.474.3300
FORSGRENFISHER.COM

evidence at trial undermines confidence in the jury's verdict, particularly when coupled with the many other discovery violations.

Respectfully,

Caitlinrose H. Fisher

c:      Counsel of record (via e-service)

# Exhibit A

168 F.4th 1068
United States Court of Appeals, Eighth Circuit.

UNITED STATES of America, Plaintiff - Appellee
v.
Brad WENDT, Defendant - Appellant
Firearms Regulatory Accountability Coalition, Inc.;
Palmetto State Armory, LLC; B&T USA, LLC; Gun
Owners of America, Inc.; Gun Owners Foundation;
State of West Virginia; State of Arkansas; State
of Missouri; State of New Hampshire; State of
Utah; State of Kansas; State of Montana; State of
South Carolina, Amici On Behalf of Appellant(s)

No. 24-2458
|
Submitted: April 17, 2025
|
Filed: March 3, 2026

**Synopsis**
**Background:** Defendant, who was chief of police and
owned and operated firearm stores that were federal firearms
licensees (FFL), was convicted in the United States District
Court for the Southern District of Iowa, Stephen H. Locher, J.,
of nine counts of making false statements, conspiracy to make
false statements and defraud the Bureau of Alcohol, Tobacco,
Firearms and Explosives (ATF), and illegal possession
of a machine gun. Following trial, defendant moved for
judgment of acquittal or a new trial. The District Court, 2024
WL 5055557, denied motion and subsequently sentenced
defendant to a below-Guidelines term of imprisonment of
sixty months, a fine of $50,000, and ordered the forfeiture of
fifteen firearms. Defendant appealed.

**Holdings:** The Court of Appeals, Erickson, Circuit Judge,
held that:

district court did not abuse its discretion in instructing jury
that possession of a machine gun is restricted to official use by
a law enforcement agency, and that a requested demonstration
of a machine gun must be for possible future purchase by the
law enforcement agency and not for some other purpose;

district court did not abuse its discretion by referring to
a "possible" future purchase of machine guns in one jury
instruction and a "potential" future purchase in another;

district court did not abuse its discretion in refusing to give
defendant's requested jury instruction on ambiguity;

defendant was entitled to vacatur of his conviction for
possession of a machine gun (Per Erickson, Circuit Judge,
with one judge concurring in the result.); and

fraud sentencing guideline's cross-reference applied to
defendant.

Affirmed in part, reversed in part, and remanded.

Stras, Circuit Judge, filed opinion concurring in part and
concurring in the judgment.

Kelly, Circuit Judge, filed an opinion dissenting in part.

**Procedural Posture(s):** Appellate Review; Trial or Guilt
Phase Motion or Objection; Post-Trial Hearing Motion.

**West Codenotes**

**Recognized as Unconstitutional**
18 U.S.C.A. § 922(o)(2)(A)

Appeal from United States District Court for the Southern
District of Iowa - Central

**Attorneys and Law Firms**

Counsel who presented argument on behalf of the appellant
and appeared on the brief was Nicholas A. Klinefeldt, of
Des Moines, IA. The following attorney also appeared on the
appellant brief; Rachel A. Hansen, of Des Moines, IA.

Counsel who presented argument on behalf of the appellee
and appeared on the brief was Kyle P. Hanson, AUSA, of Des
Moines, IA.

Before KELLY, ERICKSON, and STRAS, Circuit Judges.

**Opinion**

ERICKSON, Circuit Judge.

 **\*1071** Brad Wendt was convicted on nine counts of making
false statements in violation of 18 U.S.C. § 1001(a)(2);

Appellate Case: 24-3453    Page: 4    Date Filed: 06/02/2026 Entry ID: 5646891

conspiracy to make false statements and defraud the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in violation of 18 U.S.C. § 371; and illegal possession of a machine gun in violation of 18 U.S.C. § 922(o). Wendt appeals his convictions on all counts, or, in the alternative, the length of his sentence. For the reasons that follow, we reverse the possession conviction and affirm the remaining convictions and the sentence.

## I. BACKGROUND

Since 2013, Brad Wendt owned and operated two firearms stores that were each a federal firearms licensee ("FFL") named BW Outfitters, Inc. and B Wout Fitters, Inc. (collectively "BW Outfitters"). The stores were located in Anita, Iowa and Denison, Iowa. In approximately 2016, Wendt obtained Special Occupancy Tax ("SOT") status for BW Outfitters, which allowed it to purchase and sell machine guns.

On July 2, 2018, Wendt became the Chief of Police of Adair, Iowa. As the chief, Wendt gained the authority to write "law letters" for Adair police officers to purchase machine guns ("purchase law letter") or for an FFL-SOT to purchase a machine gun for the purpose of demonstrating the gun to the Adair Police Department to help it determine whether it wanted to purchase that machine gun ("demonstration law letter").

The City of Adair has less than 800 residents and, including Wendt, only two full-time police officers. Seventeen days after taking office, Wendt wrote his first law letter, which sought permission for one of his stores to acquire a machine gun. From July 2018 to July 2022, Wendt wrote law letters for purchase or demonstration of ninety machine guns.

Based on communications Wendt had with others through Facebook, he wanted to quit his job as Chief of Police, but he did not want to give up the ability to write law letters for his stores. He discussed stockpiling machine guns at his stores before he retired. The sale of machine guns could be quite lucrative. Wendt purchased Heckler & Koch MP7A2 machine guns for $2,080 each and sold two of them for $25,000 each.

Wendt used the Adair Police Department as a third location for BW Outfitters. **\*1072** The advantage the police department had over his other two locations was that Wendt could purchase more than one of the same make and model machine gun. While the machine guns were registered to the police department, Wendt purchased them with his own funds.

In his purchase law letters, he claimed that the machine guns were being purchased for official use and not for resale. Yet, within six months of receiving three MP7A2s in 2021, he resold two of them. Then Wendt turned around eight months later and wrote a purchase law letter for more MP7A2s to restock his inventory. In total, Wendt made a profit of $79,660 from the sale of machine guns registered to the Adair Police Department.

Wendt wrote several demonstration law letters that were inconsistent with a genuine interest in having a demonstration for the Adair Police Department. On March 1, 2022, he wrote a demonstration law letter for an MP7A2 despite already having one registered to the police department. In addition, two days later, before the demonstration could even occur, Wendt wrote a purchase law letter for three MP7A2s. Wendt also wrote three demonstration law letters for the Heckler & Koch G36C machine gun in an eighteen-month period.

Wendt used his position as Chief of Police to help Robert Williams and Jonathan Marcum purchase machine guns for their firearms stores. Wendt wrote demonstration law letters for Williams and Marcum knowing the Adair Police Department had no interest in seeing a demonstration of the machine guns nor had any interest in future purchase of the guns. Neither Williams nor Marcum ever demonstrated the machine guns to the Adair Police Department. Marcum pled guilty to conspiracy to make false statements and defraud the ATF.

On April 16, 2022, BW Outfitters organized, advertised, sponsored, and operated a machine gun shoot in Woodbine, a city more than fifty miles from Adair. Wendt attended the event without his police uniform and was off duty according to the City of Adair's payroll records. No law enforcement personnel were in uniform at the event, and the only on-duty law enforcement personnel in attendance were the undercover officers investigating Wendt's criminal activities.

BW Outfitters supplied approximately eleven machine guns for attendees to shoot. Wendt brought a U.S. Ordnance M60, which was registered to the Adair Police Department. Williams, who owned the land where the event took place, also supplied machine guns for attendees to shoot.

BW Outfitters supplied the ammunition used at the event. Civilians paid for the ammunition they fired, but BW Outfitters did not charge anyone employed in law

Appellate Case: 24-3453 Page: 5 Date Filed: 06/02/2026 Entry ID: 5646891

enforcement for ammunition. At least three sheriff's deputies fired machine guns at the event.

Following a jury trial in which Wendt was found guilty on eleven counts, he moved for a judgment of acquittal or a new trial. The district court denied the motion. The district court sentenced him to a below-Guidelines term of imprisonment of sixty months, a fine of $50,000, and ordered the forfeiture of fifteen firearms. This appeal followed.

## II. DISCUSSION

To understand some of the issues raised on appeal, a brief explanation of the law relevant to the transfer of machine guns is required. It is generally illegal to transfer or possess a machine gun. 18 U.S.C. § 922(o)(1). This prohibition is subject to two exceptions: (1) transfer to or possession by any government agency or (2) transfer or possession of a machine gun possessed before May 19, 1986. **\*1073** 18 U.S.C. § 922(o)(2); see also 27 C.F.R. § 479.105(a) (noting the May 19, 1986 cutoff). The relevant exception in this case is transfer to or possession by any government agency, specifically the Adair Police Department.

A purchase law letter is required to transfer a machine gun to a government agency. 26 U.S.C. § 5812(a); 27 C.F.R. § 479.105(a). The purchase law letter must identify the government agency that will be using the machine gun within the scope of its official duties. 26 U.S.C. § 5812(a); 27 C.F.R. 479.105(a). Possession by a government agency falls under the "public authority exception," which states it is "by or under the authority of" the agency, § 922(o)(2)(A), meaning the purchase is for the official use by the agency. See United States v. Warner, 5 F.3d 1378, 1381 (10th Cir. 1993) (statute "is properly read to permit only lawful possession of machine guns by federal or state agents acting in an official capacity."). Similarly, any importation of a machine gun for either purchase by a government agency, or for demonstration to a government agency, must be for the "official use" of the agency. 27 C.F.R. § 479.105(c).

A demonstration law letter is required to sell a machine gun to an FFL-SOT for the purpose of demonstrating the machine gun to a government agency. 27 C.F.R. § 479.105(d). The letter must state the "need for a particular model or interest in seeing a demonstration of a particular weapon." Id. The ATF will approve the transfer "if it is established by specific information the expected governmental customers who would require a demonstration of the weapon ...." Id.

A. Jury Instructions

Wendt objects to the wording of two jury instructions and to the district court's refusal to give one of his requested instructions. We review a district court's formulation of jury instructions for abuse of discretion. United States v. Espinoza, 684 F.3d 766, 783 (8th Cir. 2012). A district court does not abuse its discretion if the jury instructions "fairly and adequately submitted the issues to the jury." Id. (citations omitted and cleaned up). A jury instruction that tracks the plain and unambiguous language of the statute is an adequate instruction. United States v. White Calf, 634 F.3d 453, 457 (8th Cir. 2011).

### 1. False Statements

Wendt's convictions for making false statements were under 18 U.S.C. § 1001(a)(2). The elements of this crime are (a) knowingly and willfully (b) making any false, fictitious, or fraudulent statement or representation (c) that is material (d) in any matter within the jurisdiction of the executive, legislative, or judicial branch of the federal government. § 1001(a)(2).

Wendt does not challenge the jury instructions that provide the elements of the crime, which track the plain and unambiguous language of the statute. Instead, he challenges an ancillary instruction and an alleged word conflict between two other instructions.

First, Wendt asserts the district court abused its discretion with Instruction No. 24, entitled "Law Letters," by including the phrase "possession of that machine gun is restricted to official use by the law enforcement agency" and the sentence "[t]he requested demonstration must be for possible future purchase and not for some other purpose." This language is an accurate statement of the law. The laws regarding transfer of machine guns require that it is "by or under the authority of" or for the "official use" of the government agency. 18 U.S.C. § 922(o)(2)(A); 27 C.F.R. § 479.105(c); see also Warner, 5 F.3d at 1381 ("under the authority of" means acting in an official capacity). A demonstration requires "information as to **\*1074** the availability of the machine gun to fill subsequent orders ...." 27 C.F.R. § 479.105(d).

In addition, this language in Instruction No. 24 summarizes two of the materially false statements Wendt made in his law letters. For the purchase law letter conviction, Wendt wrote,

Appellate Case: 24-3453 Page: 6 Date Filed: 06/02/2026 Entry ID: 5646891

in relevant part: "These firearms will be the property of our Adair Police Department and are not being acquired for the purpose of resale or transfer, and they will be used to carry out its official responsibilities and duties." For the demonstration law letter convictions, Wendt wrote, in relevant part: "Our agency would appreciate a detailed overview of the stated weapon to further determine if it is suitable for future purchase, and official use by the sworn officers within the Adair Police Dept."

Wendt's statements about official use and the transfer being for possible future purchase by the police department were false when made. With the purchase law letter, he knew he was acquiring machine guns for resale. With the demonstration law letters, he never intended for the Adair Police Department to receive the demonstration or purchase the machine guns. These statements were material because the ATF would not approve the transfer unless the machine gun was for official use by a government agency or the FFL-SOT would demonstrate the machine gun to a government agency for its potential future purchase. 27 C.F.R. §§ 479.105(a) & (d).

Second, Wendt asserts the district court abused its discretion through an alleged conflict in the use of "possible" future purchase in Instruction No. 24 and "potential" future purchase in Instruction No. 17. This hyper technical argument about the subtle differences between "possible" and "potential" does not address how a reasonable juror would have interpreted the instructions. See Roberts v. Bowersox, 137 F.3d 1062, 1068 (8th Cir. 1998) (jury instructions are interpreted according to how a reasonable juror would understand them). A reasonable juror would see no difference between possible or potential in the context of a future purchase. See id. (a reasonable juror would understand "reflected upon this matter coolly and fully" to have the same meaning as "deliberated"). Regardless, at the time Wendt wrote the demonstration law letters underlying his convictions, the evidence submitted to the jury established that the Adair Police Department had no intention of either possibly or potentially purchasing the machine guns in the future.

The jury instructions fairly and adequately submitted the legal elements of the false statement charges to the jury. The district court did not abuse its discretion with its formulation of the jury instructions. Espinoza, 684 F.3d at 783.

*2. Ambiguity*

Wendt asserts that the district court abused its discretion in refusing to give his requested jury instruction on ambiguity. Wendt relies on United States v. Harra, 985 F.3d 196 (3d Cir. 2021), for the proposition that when federal guidance is ambiguous, the court is required to give an ambiguity instruction in a false statements case.

In Harra, the bank had a policy that if a mature loan with unpaid principal was in the process of renewal and the borrower was current on interest payments, the bank did not report the loan as "past due." 985 F.3d at 205. Three federal agencies had jurisdiction over the bank, and each agency had guidance pertaining to reporting past due loans. Id. The guidance from the Federal Reserve and the SEC stated that the past due status of a loan is determined by the terms of the contract. Id. at 206. The Office of Thrift Supervision issued **\*1075** guidance that stated a loan was not past due if management had restructured or extended a loan. Id. The government charged bank officials with making false statements when they followed the bank policy of not reporting loans in renewal as past due. Id. at 207.

The court held that the agencies' regulations and guidance were ambiguous on the meaning of "past due." Id. at 218. While the government relied on the plain meaning of "past due," it ignored the modifier "contractually" in the Federal Reserve and SEC guidance. Id. Because the guidance was ambiguous, the defendants were entitled to a jury instruction regarding whether their interpretation of the guidance was reasonable. Id. at 217.

This case does not involve ambiguous guidance. The false statements here are that the machine guns were either for the official use of the Adair Police Department or that the machine guns were to be demonstrated to the Adair Police Department, so they could evaluate a future purchase. Wendt's convictions are supported by overwhelming evidence that these unambiguous statements were false at the time he wrote them. The district court did not abuse its discretion in refusing to give the Harra ambiguity instruction.

### B. Possession of Machine Gun

Wendt challenges his conviction for possession of a machine gun under § 922(o) on the basis the statute is unconstitutionally vague as applied to him. We review a

Appellate Case: 24-3453    Page: 7    Date Filed: 06/02/2026 Entry ID: 5646891

vagueness challenge *de novo*. United States v. Deng, 104 F.4th 1052, 1054 (8th Cir. 2024).

The void-for-vagueness doctrine "rests on the twin constitutional pillars of due process and separation of powers." United States v. Davis, 588 U.S. 445, 451, 139 S.Ct. 2319, 204 L.Ed.2d 757 (2019). First, a vague law fails to provide a person of ordinary intelligence fair notice of what the law demands of them. Id. Second, a vague law delegates responsibility for defining crimes to "relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide." Id. A criminal law lacking adequate standards invites arbitrary enforcement. Johnson v. United States, 576 U.S. 591, 595, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015).

To determine whether a law is unconstitutionally vague, courts may look to (1) the plain meaning of the statutory language, (2) other courts' interpretations of the law's meaning, and (3) "previous applications of the statute to the same or similar conduct." D.C. v. City of St. Louis, 795 F.2d 652, 654 (8th Cir. 1986) (citations omitted). A court may rely on a dictionary definition to determine the plain meaning of an undefined word in the statute. See Mumad v. Garland, 11 F.4th 834, 840 (8th Cir. 2021) (using the dictionary to define the statutory terms "particularly" and "serious").

Under § 922(o)(2)(A), the public authority exception to machine gun possession requires the possession to be "*by or under the authority of*, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof." The statute does not define authority or how one would demonstrate that he has the political subdivision's or department's authority. Authority means "[t]he official right or permission to act, esp. to act legally on another's behalf." Black's Law Dictionary 162 (12th ed. 2024).

Wendt was convicted of possessing an M60 machine gun at the machine gun shoot held on April 16. The M60 was registered to the Adair Police Department. Wendt was the Chief of Police of the Adair Police Department. As the head of the police department, Wendt had the right to **\*1076** act legally on the department's behalf. See Newton Police Ass'n v. Police Chief of Newton, 63 Mass.App.Ct. 697, 828 N.E.2d 952, 953 (Mass. Ct. App. 2005) ("The police chief is vested with inherent authority to direct the operations of the police department ...."). A person of ordinary intelligence would

not have fair notice that, as the supervising agent for the department, Wendt lacked the authority to allow the presence of the M60 at the machine gun shoot.

There are few cases that have analyzed a vagueness challenge to the public authority exception. In the one case involving a police officer, the court observed that a person of ordinary intelligence would be unable to decipher the meaning of authority in the context of law enforcement because a police department can act only through its agents. United States v. Vest, 448 F. Supp. 2d 1002, 1009 (S.D. Ill. 2006). One court observed the ambiguity in the public authority exception but did not have to confront the vagueness issue because the challengers were private citizens. See Farmer v. Higgins, 907 F.2d 1041, 1044, 1045 (11th Cir. 1990) (the public authority exception "is arguably ambiguous" but it does not apply to private possession).

Other courts have also avoided vagueness challenges because they were brought by private citizens. See Doe v. Biden, No. 2022-1197, 2022 WL 16545125, at *5 (Fed. Cir. Oct. 31, 2022) (exception does not apply to possession by private citizens); United States v. Spicer, 656 F. App'x. 154, 159 (6th Cir. 2016) (former sheriff's deputy possessed machine gun after his termination of employment); Warner, 5 F.3d at 1381 ("To read this subsection to permit an exception for private citizens would essentially eliminate the federal prohibition entirely."). The cases analyzing a private citizen's attempt to fit within the public authority exception provide no guidance in the present case involving a police chief.

The vagueness of the public authority exception as applied to a police chief is compounded when read in conjunction with 18 U.S.C. § 925(a)(1). Section 925(a)(1) similarly exempts machine gun possession by law enforcement from the ban in § 922(o). A person of ordinary intelligence would not have fair notice that possession of a machine gun by the police chief at the machine gun shoot was illegal under federal law.

A law may also be vague if it invites arbitrary enforcement. Johnson, 576 U.S. at 595, 135 S.Ct. 2551. In Vest, the court found the public authority exception invited arbitrary enforcement for two reasons. 448 F. Supp. 2d at 1012-13. First, the government charged Officer Vest with illegal possession even though it did not charge the other police officers who possessed the same machine gun during training. Id. at 1012. "The fact that the Government has to clarify the subset of police officers who would not be prosecuted under this statute bolsters the assertion that § 922(o)(2)(A) allows

Appellate Case: 24-3453    Page: 8    Date Filed: 06/02/2026 Entry ID: 5646891

for arbitrary enforcement because it allows the prosecution to essentially define the criminal behavior." Id. Second, the lack of a statutory definition for "authority" left the decision to the jury to decide what type of authority is proper and whether the defendant had that undefined type of authority. Id. at 1013.

The government asserts the arbitrary enforcement factor of the void-for-vagueness doctrine is inapplicable to Wendt because he was off duty, out of uniform, fifty-seven miles from Adair, and at an event sponsored by his private business. None of these standards appear in the statute or in ATF regulations. This assertion also fails to provide clarity as to which of these missing facts would preclude the government from bringing a possession charge against a law enforcement officer.

**\*1077** Could the government charge a police officer with possession of a machine gun if she had the firearm in her vehicle while off duty for a meal break or running a personal errand? Could the government charge a law enforcement agent if he was in plainclothes or undercover? Could the government charge an officer if she was only five miles outside the city where her police department was located? The lack of any clear answer to this subset of law enforcement officers illustrates the risk in arbitrary enforcement of the public authority exception. Id. at 1012.

Furthermore, the location of the event bears no relevance to an arbitrariness inquiry because Iowa permits municipal police officers to perform official acts outside the city they serve. State v. Snider, 522 N.W.2d 815, 817 (Iowa 1994). It is also inaccurate to claim that the machine gun shoot had no connection to legitimate law enforcement purposes. The machine gun shoot was open to law enforcement personnel to allow them to observe how a variety of machine guns operate and to fire them. Officers, even if they were off duty, could use the machine guns at no charge, and at least three law enforcement personnel took advantage of this opportunity.

The government urges us to find the public authority exception not vague as applied under the reasoning in United States v. Theunick, 651 F.3d 578 (6th Cir. 2011). The defendants in Theunick were not charged with possession under § 922(o), so the public authority exception was inapplicable. 651 F.3d at 587. Furthermore, the defendants possessed the weapons and silencers after their employment at the prosecutor's office and police department ended. Id. at 583, 584, 587. The government's reliance on United States v. Carn, No. 2:13-cr-00346, 2018 WL 1413971 (D. Nev.

Mar. 20, 2018) is similarly unavailing. Carn was not charged with a violation of § 922(o), and Carn did not work in law enforcement. 2018 WL 1413971, at *1.

Finally, the rule of lenity also requires us to resolve the application of the public authority exception in Wendt's favor. The rule of lenity is a "junior version of the vagueness doctrine" that "ensures fair warning by ... resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." Deng, 104 F.4th at 1055 (quoting United States v. Lanier, 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)). The rule of lenity requires resolving ambiguities in a criminal statute in the defendant's favor. Davis, 588 U.S. at 464, 139 S.Ct. 2319.

The public authority exception is clearly unavailable to private citizens. See, e.g., Warner, 5 F.3d at 1381 (the exception does not apply to private citizens). What is much less clear is whether the exception is inapplicable to Wendt under these circumstances. With that lack of clarity, we must apply the rule of lenity in Wendt's favor to grant him the protection of the public authority exception. Davis, 588 U.S. at 464, 139 S.Ct. 2319.

A person of ordinary intelligence in Wendt's position would not have fair notice that his possession of a machine gun registered to his police department at a machine gun shooting event was illegal. The public authority exception as applied to police officers in this situation also invites arbitrary enforcement. Because the public authority exception as applied to Wendt in his capacity as Chief of Police is unconstitutionally vague, his conviction for possession of a machine gun under § 922(o) is vacated.

### C. Sentence

Wendt asserts the district court erred in using the cross reference under USSG § 2B1.1(c)(3) to apply the base offense **\*1078** level 18 under USSG § 2K2.1(a)(5) to the conspiracy and false statement convictions. Whether the district court erred in applying the Guidelines is reviewed *de novo*. United States v. Bah, 439 F.3d 423, 427 (8th Cir. 2006).

When a defendant is convicted of making false statements, § 2B1.1(c)(3) states that the base offense level should be determined by the guideline for the offense specifically covered by "the conduct set forth in the count of conviction ...." When interpreting the Guidelines, in the absence of ambiguity, the plain language controls. Id. Section 2B1.1(c)(3) applies "only if the conduct alleged in the

Appellate Case: 24-3453    Page: 9    Date Filed: 06/02/2026 Entry ID: 5646891

count of the indictment of which the defendant is convicted establishes the elements of another offense." Id. (quoting United States v. Genao, 343 F.3d 578, 583 (2d Cir. 2003)).

The district court determined that the conduct set forth in the counts of conviction for conspiracy and false statements established the elements of an offense under 18 U.S.C. § 922(a)(6). The elements of § 922(a)(6) are (1) knowingly making false statements (2) with respect to a fact material to the lawfulness of the transfer of a firearm and (3) intending to or likely to deceive an importer, manufacturer, dealer, or collector of firearms.

For the false statements, the counts of conviction state, in relevant part:

> BRADLEY EUGENE WENDT, knowingly and willfully made and caused to be made, and used and caused to be used, in a matter within the jurisdiction of a department of agency of the United States, namely, the ATF, a materially false, fictitious, and fraudulent statement and representation. Specifically, WENDT stated on demonstration law letters that the machine gun(s) were requested for demonstration for future potential purchase by the Adair Police Department, when in fact WENDT was acquiring the machine guns for his personal gain and profit and /or to facilitate the transfer of machine guns to other FFL-SOTs ....

The conspiracy count of conviction contains similar language and includes an extensive recitation of the facts identifying various FFL-SOTs whom Wendt deceived with his law letters.

While the indictment and trial focused on Wendt's deception of the ATF, the counts of conviction also described Wendt's deception of the FFL-SOTs, which included importers, manufacturers, and dealers. Because the counts of conviction establish the elements of a § 922(a)(6) offense, the USSG § 2B1.1(c)(3) cross reference applies. Id. (quoting Genao, 343 F.3d at 583).

In a footnote, Wendt also asserts errors with respect to his sentence for possession of a machine gun. Because we have vacated his conviction for possession, we need not address whether he has properly raised this issue on appeal or reach the merits.

The district court did not err in applying the cross reference under § 2B1.1(c)(3). Because the district court ordered the sentence for possession of a machine gun to run concurrently with the sentences for Wendt's other convictions, the vacatur of his conviction for illegal possession of a machine gun does not alter his term of imprisonment.

**III. CONCLUSION**

For the foregoing reasons, we reverse the conviction on Count 20 of the Indictment, illegal possession of a machine gun. We remand to the district court to vacate the conviction on Count 20, vacate the special assessment on Count 20, and amend the judgment accordingly. We otherwise affirm all other matters raised on appeal.

STRAS, Circuit Judge, concurring in part and concurring in the judgment.

 **\*1079**  Handling and managing the weapons of the Adair Police Department was part of Brad Wendt's job as police chief. The question is whether the federal machine-gun ban, *see* 18 U.S.C. § 922(o), limited what he could do with them. In my view, it does not police the police. *See Skilling v. United States*, 561 U.S. 358, 403, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010) (explaining that we should, "if we can, ... construe, not condemn, Congress' enactments"). Turns out the Second Amendment confirms it.

I.

Absent two exceptions, federal law prohibits the "transfer or possess[ion] [of] a machinegun." 18 U.S.C. § 922(o)(1). One of those exceptions is for anyone acting "by or under the authority of ... a State, or a department, agency, or political subdivision thereof." *Id.* § 922(o)(2)(A). Wendt's position is that, as police chief, he was acting "under the authority of" Adair, a "political subdivision," when he took a city-registered M60 machine gun to a community shoot in another Iowa town. *Id.*

"Authority" is a familiar concept from agency law. Here, the question is one of actual authority: did Adair explicitly

Appellate Case: 24-3453   Page: 10   Date Filed: 06/02/2026 Entry ID: 5646891

or implicitly empower Wendt to do what he did? *See Dillon v. City of Davenport, 366 N.W.2d 918, 924 (Iowa 1985)* ("Actual authority includes both express and implied authority."); *see also The American Heritage Dictionary of the English Language* 142 (2d ed. 1982) (defining "authority" as "[t]he power to command, enforce laws, exact obedience, determine, or judge"); *Webster's Third New International Dictionary* 146 (1986) (defining it as "superiority derived from a status that carries with it the right to command and give final decisions"). It did not have to be a job requirement, just something that he *could* do as police chief. *See* Restatement (Third) of Agency § 2.02(1) (Am. L. Inst. 2006) (stating that implied authority extends to "acts necessary or *incidental* to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act" (emphasis added)); *United States v. Flemmi, 225 F.3d 78, 86 (1st Cir. 2000)* (explaining that implied authority includes "power" that "usually accompanies ... due performance of the task").

The answer depends on what the principal—the City of Adair—had said and done. *See* Restatement (Third) of Agency § 2.02; *Moriarty v. Glueckert Funeral Home, Ltd., 155 F.3d 859, 866 (7th Cir. 1998)* (noting that actual authority "can be created by written or spoken words or other conduct of the principal" (citation omitted)); *Dillon, 366 N.W.2d at 924* (explaining that an agent has "[a]ctual authority to act ... when a principal intentionally confers authority on the agent either by writing or through other conduct which, reasonably interpreted, allows the agent to believe that he has the power to act"). If state or local law authorized him to bring a machine gun to a community event for non-crime-fighting purposes, then what he did fell within his actual authority. *See Poindexter v. Greenhow, 114 U.S. 269, 330, 334, 5 S.Ct. 962, 29 L.Ed. 207 (1885)* ("[O]fficers have no power but what the state gives them. They act for and on behalf of the state, and in no other way.").

State law largely tells us what we need to know. As an Iowa peace officer, Wendt could carry "offensive weapon[s]," including machine guns, if his "duties or lawful activities require[d] or *permit[ted]*" it. Iowa Code § 724.2(1)(a) (emphasis added). In fact, "permit[ted]" and "certified peace officer[s]" can "go armed *anywhere* in the state at *all* times." *Id.* § 724.6(1)(c) (emphases **\*1080** added). Police officers, in other words, have powers and duties that allow them to carry weapons in places and situations in which ordinary citizens cannot. An example is the Iowa Capitol and surrounding grounds, where they can "openly carry" pistols or revolvers.

Iowa Admin. Code r. 11-100.2(2); *see, e.g., id.* r. 111-1.13(1) (excepting "peace officer[s]" from the ban on "dangerous weapon[s]" in Department of the Blind facilities); *id.* r. 371-2.5(173) (same for "weapon[s]" on fairgrounds).

For police chiefs like Wendt, state and local law provide even more discretion. As the only essential member of the "Police Division," Adair, Iowa, City Code § 6.4(B)(1) (2021), his authority extended to directing departmental actions, *see, e.g.*, Iowa Code § 400.19 (allowing the police chief to "remove, discharge, demote, or suspend a subordinate"). Unrebutted testimony from members of the Adair City Council confirmed that he had responsibility for the management and control of city-owned weapons, including machine guns. *See id.* § 400.13(3) (making members of the "city council" responsible for approving the appointment of the chief of police). According to them, bringing a machine gun along for a community shoot was "within the scope of his authority as the Adair police chief," whether he was "on duty" or not. Wendt had the same understanding. *Cf.* Restatement (Third) of Agency § 2.02 (noting that actual authority depends on how "the agent reasonably understands the principal's manifestations and objectives").

The government's concern seems to be about whether he *should* have brought one along, rather than whether he *could.* Its theory all along has been that, because Wendt was no longer on duty or within his jurisdiction, he lost his authority, even though Iowa law recognizes that peace officers can go armed "*anywhere* in the state at *all* times." Iowa Code § 724.6(1)(c) (emphases added). As the statute suggests, an officer's authority to act continues even when he is off the clock and outside city limits. *See id.; see also id.* § 724.4B(2)(b) (forbidding carrying a weapon on school grounds except for "a peace officer ... *whether or not the peace officer ... is acting in the performance of official duties*" (emphasis added)).

Consider the havoc that a contrary rule would create. Peace officers are supposed to stop crimes committed in their presence, on or off duty, and respond to calls reporting criminal activity, whenever and wherever they may be. *See id.* § 804.7(1)(a) (allowing "peace officer[s]" to "make an arrest ... [f]or a public offense committed or attempted in [their] presence"); *cf. State v. Graham, 130 Wash.2d 711, 927 P.2d 227, 233 (1996)* (explaining that a police officer has authority to act "whenever the officer reasonably believes that a crime is committed ... whether the officer is on duty or off duty"). Limiting their ability to carry a firearm

Appellate Case: 24-3453     Page: 11     Date Filed: 06/02/2026 Entry ID: 5646891

outside of ordinary business hours or in certain places would interfere with their crime-fighting function. As the lead opinion ponders, what happens to officers who stop for meals or run errands and leave a machine gun in their patrol car? Do they unwittingly violate 18 U.S.C. § 922(o)? *See United States v. Jones*, 74 F.4th 941, 951 (8th Cir. 2023) (explaining that constructive possession of a weapon occurs when a person has "dominion and control" over it or the "premises" where it is located (citation omitted)).

The answer is no. Federal law recognizes a broad exception to the machine-gun ban for any held by state or local governments. When it comes to the "transportation, shipment, receipt, *possession*, or importation" of firearms, it is not a crime when they are "imported for, sold or shipped to, or issued for the use of ... any State or *any* department, agency, or political subdivision thereof." 18 U.S.C. § 925(a)(1) (emphases added). When states **\*1081** and cities are the ones transporting, buying, or using firearms, in other words, most federal criminal prohibitions on possessing them do not apply. Machine guns included. *See id.* (retaining criminal liability only for individuals with "misdemeanor crime[s] of domestic violence," *id.* § 922(d)(9), (g)(9), and firearms not detectable by airport security devices, *see id.* § 922(p)).

In fact, the existence of the broad exception for state and local governments in § 925(a)(1) suggests Wendt's prosecution for possessing a machine gun should never have taken place at all. No one here disputes that, despite the fraud that led to the machine gun's purchase, it was "sold" and "shipped" to Adair, an Iowa "political subdivision." *Id.* § 925(a)(1). Nor that, when he took it to the community shoot, the Adair Police Department still owned it. *See id.* The point is that, even though Wendt criminally misled the ATF with his false statements, he did not illegally "possess [the city's] machinegun." *Id.* § 922(o).

The only problem is that the parties were late to acknowledge § 925(a)(1). Amici first raised it on appeal, which prompted the government to respond and Wendt to adopt the point in his reply brief. In my view, we ought to consider it anyway. The parties have now briefed it, it shows that Wendt's possession of the machine gun was not a crime, and it avoids an unnecessary 1-1-1 split ruling about whether Wendt was "acting under the authority" of Adair when he took the machine gun to a community shoot. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."). Besides, Wendt has *always* argued that, as a police officer, he was exempt from a § 922(o) charge. *See Pfoutz v. State Farm Mut. Auto. Ins. Co.*, 861 F.2d 527, 530 n.3 (8th Cir. 1988) (considering a statute raised for the first time on appeal because it "raise[d] no new issue in th[e] case, but rather suggest[ed] another theory to use in resolving the issues raised by the parties"). He just did not realize that there was a specific provision of federal law that made the argument for him. *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (explaining that the court "may consider an issue antecedent to and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief" (ellipsis and citation omitted)).

Whether the reason is the federal statute immunizing officers who possess a city-owned machine gun, *see* 18 U.S.C. § 925(a)(1), or a recognition that he acted under Adair's authority when he took it to a community shoot, *see id.* § 922(o)(2)(A), the outcome is the same.[1] Federal and state law require us to vacate Wendt's illegal-possession-of-a-machine-gun conviction.

[1]    Although the jury rejected the "government authority defense," as the dissent points out, the instructions tracked the prosecution's theory, which required a link to "official duties." These instructions did not match the *law*, as laid out in *both* statutes, *see* 18 U.S.C. §§ 922(o)(2)(A), 925(a)(1), which means the problem runs deeper than the sufficiency of the evidence.

II.

Broad exceptions for law enforcement are also consistent with the "Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022). To read § 922(o)(2)(A) and § 925(a)(1) like the government does would **\*1082** create a "grave doubt[ ]" about their constitutionality. *United States v. Palomar-Santiago*, 593 U.S. 321, 328–29, 141 S.Ct. 1615, 209 L.Ed.2d 703 (2021) (observing that courts should "construe statutes to avoid not only the conclusion that [they are] unconstitutional, but also grave doubts upon that score" (alteration in original) (citation omitted)). Fortunately, the textually sound reading is also

Appellate Case: 24-3453   Page: 12   Date Filed: 06/02/2026 Entry ID: 5646891

the constitutional one. *See Clark v. Martinez*, 543 U.S. 371, 381, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (explaining that constitutional avoidance is "a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").

The *Bruen* framework explains why. The machine gun Wendt possessed was a "bear[able] Arm[ ]" under the Second Amendment. U.S. Const. amend. II; *see Bruen*, 597 U.S. at 28, 142 S.Ct. 2111; *see also United States v. Charles*, 159 F.4th 545, 547 (8th Cir. 2025) ("The plain meaning of the word 'bear' in the Second Amendment is to 'carry[ ]' ...." (quoting *District of Columbia v. Heller*, 554 U.S. 570, 584, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008))). And there is no question he is "part of 'the people' whom [it] protects." *Bruen*, 597 U.S. at 31–32, 142 S.Ct. 2111. From there, it was the government's burden to "justify its regulation" with a "relevantly similar" historical analogue. *United States v. Rahimi*, 602 U.S. 680, 691–92, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024) (citations omitted).

The government gave us nothing, perhaps because it has nothing. [2] Its position is that no one has a Second Amendment right to carry a machine gun, law enforcement or not. But it cannot point us to a historical analogue that comes close to justifying the prosecution it brought here, one against a police officer in possession of a city-owned machine gun. It is no surprise given that officers have been carrying special arms for centuries.

[2] It was not for lack of opportunity. Wendt's opening brief, the government's response, and his reply all extensively discussed the Second Amendment. To the extent my reasoning does not *exactly* track his, we are supposed to exercise independent judgment, which is why there is a "difference between [raising] a new argument and a new issue." *Hintz v. JPMorgan Chase Bank, N.A.*, 686 F.3d 505, 508 (8th Cir. 2012); *see Kamen*, 500 U.S. at 99, 111 S.Ct. 1711 (making clear that we are "not limited to the particular legal theories advanced by the parties").

The Founding-era analogue to the modern police officer was the sheriff. In England, he was "the keeper of the king's peace," 1 William Blackstone, Commentaries *331, responsible for apprehending those "who break [it]" and "defend[ing] [the] county against any of the king's enemies."

*Id.* at *332; *see* Edward Coke, 2 *The First Part of the Institutes of the Laws of England* 168 (1628) (describing the role of the sheriff as the *principalis conservator pacis*, or "conservator of the peace"). Part of the job was—and still is—arresting criminals, whether armed or unarmed. *See* Michael Dalton, *Officium Vicecomitum: The Office and Authoritie of Sherifs* 14 (London, Co. of Stationers 1623) (explaining that it was the sheriff's duty to arrest those who "goe or ride armed offensively"). Nobody questioned that he could "lawfully beare armour and weapons" to protect himself and others. *Id.*; *see* Richard Bolton, *A Justice of Peace for Ireland of Two Bookes* 22 (1638) (noting the exception to the Statute of Northampton for "[s]heriffs and their officers," who "may lawfully beare armour or weapons"); J. Bond, *A Compleat Guide to Justices of the Peace* 43 (3d ed. 1707) ("Sheriffs, and other Officers in executing their Offices, and all other persons pursuing Hu[e] and Cry may lawfully bear Arms.").

**\*1083** This general understanding of the office carried over to the American colonies. *See* Cyrus H. Karraker, *The Seventeenth-Century Sheriff: A Comparative Study of the Sheriff in England and the Chesapeake Colonies, 1607–1689*, at 147– 52 (1930). In fact, sheriffs here were more independent and played a larger role in the community than their English counterparts, especially when it came to keeping the peace. *See id.* at 153–59 (explaining that American sheriffs were "more independent" and "important" because they were not required to serve judicial functions nor answer directly to the King); *see also, e.g.*, Proclamation, Military Command Given to the Sheriff, Maryland (1648) (giving the sheriff "Command of all the Militia" and authorizing him to "require all persons able to beare Armes within the said County" to defend against "invasion"), *reprinted in* Karraker, *supra*, at 188–89.

What never changed, however, was their authority to bear arms, including firearms. *See* George Webb, *The Office and Authority of a Justice of the Peace* 294 (Williamsburg, W. Parks 1736) (explaining that the sheriff, "[i]n the Execution of his Office ... may arm himself, and his Assistants, with Arms offensive and defensive"); Dalton, *supra*, at 14 (noting that the sheriff and his servants may "lawfully beare armour and weapons"); *see also Bruen*, 597 U.S. at 46, 142 S.Ct. 2111 (observing that "there is little evidence of an early American practice of regulating public carry"). The few regulations that existed at the time, *see id.*, recognized the authority of the sheriff and his deputies to have them. A 17th-century New Jersey law against wearing swords, for example, allowed "all officers, civil and military" to carry them. An Act Against

Appellate Case: 24-3453 Page: 13 Date Filed: 06/02/2026 Entry ID: 5646891

Wearing Swords, &c., ch. 9, N.J. Stat. (1686), *reprinted in The Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289– 90 (Somerville, Honeyman & Company 1881). So did a 1696 Massachusetts law, which required the "sheriff or other officer[s]" to "take such a number of persons, with arms or otherwise, as he or they shall think meet, for the seizing and apprehending" of criminals. An Act Against Piracy and Robbing Upon the Sea, 1696 Mass. Acts and Laws, ch. 4, § 3, *reprinted in* 1 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 247 (Boston, Wright & Potter 1869); *see* Karraker, *supra*, at 147 (discussing the sheriff's *posse comitatus* power).

Law-enforcement exceptions multiplied right alongside firearm restrictions during the 19th century. *See Bruen*, 597 U.S. at 50–54, 142 S.Ct. 2111 (discussing the "proliferat[ion]" of "public-carry restrictions" in the 19th century). Consider an 1887 Michigan statute that allowed "officers of the peace and night-watches" to go "armed with a dirk, dagger, sword, pistol" and several other weapons, even though other citizens could not. An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1, 1887 Mich. Pub. Acts 144. Or an 1869 ordinance in Van Buren, Arkansas, which prohibited traveling with loaded weapons for all but "[o]fficers of the law." Van Buren, Ark., Fire-Arms Ordinance of May 1, 1869, §§ 1–6. In Nashville, "police or other officers" could carry "pistol[s], bowie-kni[ves], dirk-kni[ves], ... or other deadly weapon[s]," which were illegal to have otherwise. Nashville, Tenn., Ordinances, pt. 3, tit. 12, ch. 108, §§ 1–6 (1873), *reprinted in Ordinances of the City of Nashville* 340–41 (William K. McAlister, Jr. ed., Nashville, Marshall & Bruce 1881).[3]

---

[3]     *See also* An Act to Regulate the Keeping and Bearing of Deadly Weapons, ch. 34, § 1, 1871 Tex. Gen. Laws 1st Sess. 25, 25–27 (permitting the carrying of a "pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, [or] bowie-knife" if done so "as a militiaman in actual service, or as a peace officer or policeman"); La Crosse, Wis., Ordinance no. 14, § 15 (Oct. 8, 1880), *reprinted in Charter and Ordinances of the City of La Crosse* 176–77 (La Crosse, The Republican and Leader 1888) (banning the carrying of a "pistol, slungshot, knuckles, bowie knife, dirk or any other dangerous weapon" except for "policem[e]n or other officer[s] authorized to maintain the peace"); *cf.* Memphis, Tenn., Carrying

Concealed Weapons, § 3 (Dec. 1, 1857), *reprinted in Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1860*, at 286–87 (S. Bankhead ed., Memphis, Saunders, Oberly & Jones 1860) (allowing an officer to temporarily carry a "pistol, bowie-knife, dirk or any concealed weapon[ ]" if permitted to do so by his "*commanding officer*" (emphasis added)).

**\*1084**  It is true that some laws tied the right to carry dangerous weapons to the duties the officers had. *See, e.g.*, An Act to Prohibit the Carrying of Concealed Deadly Weapons, § 2, 1853 Ky. Acts 186 (excepting "sheriffs, constables, marshals, and policemen carry[ing] such weapons as are necessary to their protection in the efficient *discharge of their duty*" (emphasis added)); Georgia Penal Code, art. 3, Carrying of Deadly Weapons at Courts, § 348 (1870), *reprinted in* Orville Park, *Park's Annotated Code of the State of Georgia* 234 (1914) (excluding a "sheriff, deputy sheriff, coroner, constable, marshal, policeman, or other arresting officer, or their posse, acting in the discharge of their *official duties*" (emphasis added)). But nothing suggests that there were prosecutions for officers who held on to their weapons, dangerous or otherwise, after work ended for the day. *Cf. Nunn v. State*, 1 Ga. 243, 246 (Ga. 1846) (explaining that it would be absurd to interpret an exception for possession "in the actual discharge of their respective duties" to require "sheriffs, constables, marshals, overseers, and patrols, to procure a new supply of arms for each successive service, and *throw them away* when it was accomplished"). It was uncommon to police the police, not to see them with dangerous or unusual weapons.

What should be clear by now is that we do not have a "historical tradition" of regulating the firearms kept by law enforcement, machine guns or not. *Bruen*, 597 U.S. at 24, 142 S.Ct. 2111. States and localities sometimes prohibited particularly "dangerous" weapons like "pistols, Bowie knives, or slung-shots," but almost never for sheriffs, their deputies, or other law-enforcement officers. *Bianchi v. Brown*, 111 F.4th 438, 508–09, 508 n.35 (4th Cir. 2024) (en banc) (Richardson, J., dissenting) (collecting historical sources). Even assuming that machine guns are "dangerous and unusual,"[4] *see Bruen*, 597 U.S. at 47, 142 S.Ct. 2111, law enforcement almost certainly has the right to bear them under the Second Amendment.

---

[4]     Although we held in *United States v. Fincher* that "possession of [a machine] gun[ ] d[oes] not fall

Appellate Case: 24-3453     Page: 14     Date Filed: 06/02/2026 Entry ID: 5646891

within the protection of the Second Amendment," 538 F.3d 868, 872 (8th Cir. 2008), it is hard to square with *Bruen*. *Compare id.* at 873 (concluding that possession of a machine gun was not protected by the Second Amendment because it was not "reasonably related to a well[-]regulated militia"), *with Bruen, 597 U.S. at 20, 26–30, 142 S.Ct. 2111* (explaining that the right "does not depend on service in the militia" and requires firearms regulations to be consistent with the Second Amendment's "text and historical understanding"); *see also Charles, 159 F.4th at 546–48* (analyzing a facial challenge to § 922(o) under *Bruen*, not *Fincher*).

### III.

The better reading is that it was not a crime for Wendt, Adair's police chief, to take a city-owned machine gun to a community shoot. *See* 18 U.S.C. §§ 922(o)(2)(A), 925(a)(1). And even if there were room to argue it was, I would still adopt the more permissive interpretation **\*1085** to avoid the constitutional doubt that would otherwise arise. In the end, I too vote to vacate Wendt's illegal-possession-of-a-machine-gun conviction, but only because what he did here is not—and never has been—a crime.

KELLY, Circuit Judge, dissenting in part.

Federal law generally prohibits the possession of machine guns. One exception, and the one relevant here, is that this prohibition does not apply to possession of a machine gun "by or under the authority of[ ] the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof[.]" 18 U.S.C. § 922(o)(2)(A). Wendt was the Chief of Police for the City of Adair, Iowa. But he was charged with possessing a machine gun when he was off duty, working at a for-profit shooting event for his privately-owned gun shop. Today, the lead opinion concludes that a person of ordinary intelligence would fail to understand that Wendt's conduct at this event was not "under the authority of" the Adair Police Department. I respectfully disagree.

When a defendant makes an as-applied challenge to a conviction on the grounds of vagueness, we examine that defendant's particular conduct, rather than the conduct of other, hypothetical defendants. *See United States v. Deng,*

104 F.4th 1052, 1054 (8th Cir.), cert. denied, ––– U.S. –––, 145 S. Ct. 348, 220 L.Ed.2d 123 (2024). "That's because a defendant 'who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.' " Id. (quoting United States v. Cook, 782 F.3d 983, 987 (8th Cir. 2015)). Here, Wendt's conduct, as found by the jury, was clearly proscribed by § 922(o).

Wendt could lawfully possess a machine gun "under the authority" of the Adair Police Department. But he was not acting as a police officer when he possessed the machine gun that formed the basis of his § 922(o) conviction. He was not in Adair, nor was he engaged in police-related activity or training. He was miles away, working on behalf of his own private business, BW Outfitters, where his employees helped him staff an event at which private citizens could pay BW Outfitters to shoot a machine gun that was registered to the Adair Police Department. The event was planned, organized, and hosted by Wendt and BW Outfitters for the benefit of Wendt's business. It was in this context that Wendt possessed the machine gun, and that he allowed others to possess it as well. Unlike Vest, which the lead opinion and Wendt rely on, this is not a case where the government "has *no* evidence" that Wendt ever "used the machine gun for anything but law enforcement purposes." Cf. United States v. Vest, 448 F. Supp. 2d 1002, 1004, 1009 (S.D. Ill. 2006) (overturning a § 922(o) conviction where the defendant exclusively used the machine gun at issue to fulfill his duties as the lead rifle instructor for the Illinois State Police). Wendt used the machine gun at a commercial event, on private property, that he hosted as a citizen-business owner. The record shows no publicized connection to the Adair Police Department or, indeed, *any* police department. It is not necessary for factors such as these to be listed in a statute or ATF regulation for a person of ordinary intelligence to understand that possessing a machine gun at an event like this—which included passing the machine gun to non-law enforcement participants—exceeded the bounds of "the authority" granted to Wendt by the Adair Police Department.

And these are not the only factors before us in this as-applied challenge. A jury convicted Wendt of making false statements to ATF to obtain several machine **\*1086** guns, and the court upholds those convictions today. In letters to ATF, he represented that he was requesting machine guns that would be used to carry out the official duties and responsibilities of the Adair Police Department or for demonstration for future potential purchase by the Adair Police Department,

Appellate Case: 24-3453    Page: 15    Date Filed: 06/02/2026 Entry ID: 5646891

and that the machine guns were not acquired for the purpose of resale or transfer. The jury's verdicts make clear it found that at least some of Wendt's statements were false and that he knew they were false at the time he made them. ATF has extensive protocols in place to prevent unauthorized possession of machine guns, and the record and verdicts establish that Wendt was deeply familiar with those protocols and limitations. Thus, it follows that Wendt understood there were parameters on his authority as police chief to obtain and possess machine guns, and a jury could reasonably infer that he also understood his possession of the machine gun at the BW Outfitters event exceeded those parameters. [5]

[5]    The concurrence asserts that Wendt's § 922(o)(2) conviction should be vacated not on vagueness grounds but because the conduct was not criminal in the first place. As an initial matter, Wendt did not raise this argument on appeal. But even if it were properly before us, it is simply an attack on the sufficiency of the evidence. The jury was instructed on the "government authority defense." The instruction explained the jury must return a "not guilty" verdict if Wendt "proves that it is more likely true than not true that the possession of a machine gun [as charged] was by or under the authority of the City of Adair or the Adair Police Department." The jury found, as a factual matter, that Wendt did not meet his burden. We should not disturb that finding sua sponte. Tukaye v. Troup, 157 F.4th 958, 961 n.2 (8th Cir. 2025) ("Claims not raised in an opening brief are deemed waived.") (quoting Jenkins v. Winter, 540 F.3d 742, 751 (8th Cir. 2008)); see also United States v. Cannon, 160 F.4th 911, 917 (8th Cir. 2025) (construing the evidence on a sufficiency challenge

"in the light most favorable to the verdict" (quoting United States v. Jackson, 142 F.4th 1095, 1101 (8th Cir. 2025))). As to the Second Amendment argument addressed in the concurrence, it was not raised on appeal, depriving the court of the value of adversarial briefing on a significant legal theory.

The lead opinion asks several questions about the scope of prosecutorial discretion to enforce the machine gun prohibition in the face of the public authority exception to § 922(o). And because it cannot summon clear answers to those questions, it finds further support for Wendt's as-applied vagueness challenge to his conviction. But whatever the answers might be to questions about meal breaks or officers working in an undercover capacity, they are simply not relevant here because, under the void-for-vagueness doctrine, we do not "speculate about possible vagueness in hypothetical situations not before the Court." United States v. Green, 954 F.3d 1119, 1124 (8th Cir. 2020) (quoting Adam & Eve Jonesboro, LLC v. Perrin, 933 F.3d 951, 959 (8th Cir. 2019)). No one suggests that any of these presumably "closer calls" are at play in this case, and they do not support the assertion that the statute was arbitrarily enforced against Wendt. Nor would it make a difference if, as the concurrence suggests, the public authority exception were so broad that off-duty officers could possess machine guns anywhere in the state. Even so, Wendt's conduct in possessing a machine gun at a commercial event and allowing non-officers to shoot it would still exceed that scope.

I concur in the lead opinion in large part, but I respectfully dissent as to Section II.B.

**All Citations**

168 F.4th 1068

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit B

Appellate Case: 24-3453    Page: 17    Date Filed: 06/02/2026 Entry ID: 5646891

2026 WL 1325138
Only the Westlaw citation is currently available.
United States Court of Appeals, Eighth Circuit.

UNITED STATES of America, Plaintiff - Appellee

v.

Christopher AGBAJE, doing business as
Ace Telecommunications & Consultancy
Services, Inc., Doing Business as Acorin
USA, LLC, Defendant - Appellant

No. 24-2944
|
Submitted: May 16, 2025
|
Filed: May 13, 2026

**Synopsis**
**Background:** Defendant was convicted after jury trial in the United States District Court for the District of North Dakota, Daniel M. Traynor, J., of money laundering and of aiding and abetting mail fraud and wire fraud, and the District Court, Traynor, J., 2024 WL 3673104, denied defendant's post-verdict motion for new trial. Defendant appealed.

**Holdings:** The Court of Appeals held that:

certain statements that cooperating witness made during preparation session were highly probative of bias and admissible as impeachment evidence, and

error in excluding such statements was not harmless.

Reversed and remanded.

**Procedural Posture(s):** Appellate Review; Trial or Guilt Phase Motion or Objection; Post-Trial Hearing Motion.

Appeal from United States District Court for the District of North Dakota - Western

**Attorneys and Law Firms**

Counsel who presented argument on behalf of the appellant and appeared on the brief was Jeffrey Justman, of Minneapolis, MN. The following attorney(s) also appeared on the appellant brief; William Dane DeKrey, of Moorhead, MN,

Joshua N. Turner, of Minneapolis, MN, David Yoshimura, of Des Moines, IA, Alexandra K. Benton, of Denver, CO, Josiah Young, of Minneapolis, MN, Mark E. Bini, of New York, NY, Kaela Dahan, of New York, NY.

Counsel who presented argument on behalf of the appellee and appeared on the brief was Jonathan O'Konek, AUSA, of Bismarck, ND.

Before BENTON, GRASZ, and STRAS, Circuit Judges.

**Opinion**

PER CURIAM.

**\*1** A jury convicted Christopher Agbaje of money laundering and of aiding and abetting mail fraud and wire fraud. At trial, Agbaje unsuccessfully moved to admit certain statements made during the government's witness preparation of Ome Etue, Agbaje's alleged accomplice and — as the government acknowledges — "an important witness in the United States' case." Agbaje appeals several aspects of his conviction and sentence, including the sufficiency of the evidence and the district court's decision to exclude the statements from Etue's preparation as irrelevant. As to the statements, Agbaje argues they were relevant to Etue's bias and credibility. We agree, and because the error was not harmless, we reverse and remand for a new trial.

### I. Background

In November 2020, an imposter posing as "Stephen Kersey" emailed a North Dakota law firm requesting representation in a dispute with a Bismarck, North Dakota, company over an unpaid debt. The imposter then informed the law firm that the Bismarck company had agreed to pay the debt directly to the firm. Shortly after, the law firm received a fraudulent $198,850 check purportedly from the Bismarck company. The imposter told the law firm to deposit the check, deduct its fees, and wire the remainder based on account information that would be provided. The law firm later wired $198,336.68 to an account that Etue had opened in the name of "Ace Telecommunications and Consultancy SER." Etue then wired $180,000 from that account to a Danish account in the name of "Aller Aqua," which was purportedly a Danish fish feed company with a Nigerian subsidiary. In January 2021, Agbaje received an email from "appointed Forex Changers for Aller Aqua Nigeria," confirming that they had purchased "funds of [$]175,500 and [$]180,000 ... from McBag Limited for

Appellate Case: 24-3453   Page: 18   Date Filed: 06/02/2026 Entry ID: 5646891

onward payment to Aller Aqua Denmark."[1] Agbaje resided in Nigeria and owned McBag Limited.

[1]     The government presented evidence of a similar scheme in November 2020 that involved a Florida law firm. The Stephen Kersey imposter directed the Florida law firm to wire $195,500 to an account opened by Etue in the name of "Acorin USA LLC." Etue then wired $175,500 from that account to the Danish Aller Aqua account.

The government charged Etue with mail fraud, wire fraud, and money laundering in August 2021. He agreed to cooperate and later testified at Agbaje's trial. There, Etue testified that Agbaje was a longtime friend with several business ventures in Nigeria, including a fish farm and a telecommunications company called Acorin Limited. According to Etue, he entered a business partnership with Agbaje, who directed him to register two companies in the United States: "Ace Telecommunications and Consultancy Services LLC" and "Acorin USA LLC." Etue opened a bank account for each entity, and Agbaje told Etue he would receive money in those accounts from lawyers who were investing in Agbaje's fish farm. As Etue explained, he wired the $180,000 from the Ace Telecommunications account to the Danish Aller Aqua account at Agbaje's direction, believing it was payment for fish feed. Even though Etue was facing up to 60 years of imprisonment, his cooperation resulted in a pretrial diversion agreement under which the government dismissed all the charges against him after he completed 12 months of probation.

**\*2** Before trial, the prosecutor met with Etue for a preparation session, which was recorded. During the session, the prosecutor stated, "Here's my pitch to you," before explaining his theory of how Agbaje had used Etue to commit money laundering and asking if Etue had further information supporting that theory. A little later, Etue indignantly remarked,

> For him to put me through this, and again, I'm happy that you guys believe me, okay, gave me this opportunity to actually now prove that, yes, this idiot needs to be caught.... I've been holding onto this for two and a half years. I had to call some people, sit down with me, I'm like, "Here's what [Agbaje] did to me." And the thought was, "Oh my god!"

The prosecutor then read an email Agbaje sent in November 2021 to an unknown recipient. In this email, Agbaje requested a contact who could provide a law firm or escrow account

to receive and legitimize funds that had been paid to another of Agbaje's contacts for illegitimate transactions. When Etue heard Agbaje's reference to illegitimate transactions, he exclaimed, "Wow, wow, wow! Are you serious?" After reading the email, the prosecutor explained how he thought the email related to the North Dakota fraud scheme. Etue responded, "Are you kidding me? Are you? Oh-haha-oh wow, this is mind blowing!" He also added that he was going to provide some of his Whatsapp conversations with Agbaje, saying "please share them with [the prosecutor] and the team. Oh my god!" The prosecutor then told Etue, "The way this [email] reads to me is that [Agbaje] has knowledge of the scheme, right?" And Etue replied, "Ooh! Mind blowing.... Thank you guys. I mean this is exactly what I needed, right?"

During the cross-examination of Etue at Agbaje's trial, Agbaje sought to admit several statements from this exchange to show that the government had "essentially coach[ed] and shap[ed] the witness's testimony ...." Unconvinced that the preparation session influenced Etue's trial testimony, the district court stated, "I find that the statements are not relevant[,] and they will not be allowed." Defense counsel then moved to admit the full interview as an exhibit and filed a letter overnight to request reconsideration. In the letter, counsel argued the preparation session statements were relevant to Etue's credibility and showed improper witness coaching. The next morning, the district court concluded that the government's preparation of Etue was not improper, so it declined to reconsider its ruling. The jury ultimately acquitted Agbaje of mail and wire fraud but convicted him of aiding and abetting the same. When Agbaje moved for a new trial, the district court again concluded that "any inquiry into the government's preparation with Mr. Etue was properly excluded at trial."

## II. Analysis

"We review the district court's decision to exclude evidence for an abuse of discretion." *United States v. Hardin*, 889 F.3d 945, 948 (8th Cir. 2018) (quoting *United States v. Counce*, 445 F.3d 1016, 1018 (8th Cir. 2006)). "A district court's evidentiary rulings are subject to harmless error analysis under Federal Rule of Criminal Procedure 52(a)." *United States v. Garrett*, 103 F.4th 490, 496 (8th Cir. 2024) (cleaned up). "An evidentiary error is harmless if the substantial rights of the defendant were unaffected and the error did not influence or had only a slight influence on the verdict." *United States v. Davis*, 859 F.3d 592, 597 (8th Cir. 2017)

Appellate Case: 24-3453     Page: 19     Date Filed: 06/02/2026 Entry ID: 5646891

(quoting *United States v. Peneaux*, 432 F.3d 882, 894 (8th Cir. 2005)); *see also United States v. Dominguez Benitez*, 542 U.S. 74, 81, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) ("To affect substantial rights, an error must have substantial and injurious effect or influence in determining the verdict." (cleaned up)). "The government bears the burden of proving an error is harmless." *Davis*, 859 F.3d at 597.

**\*3** "[E]vidence tending to show a substantial reason for bias or interest in an important witness is never collateral or irrelevant." *United States v. Peltier*, 585 F.2d 314, 332 (8th Cir. 1978) (quoting *Barnard v. United States*, 342 F.2d 309, 317 (9th Cir. 1965)). As a result, bias may be proven by extrinsic evidence. *Johnson v. Brewer*, 521 F.2d 556, 561–62, 562 n.13 (8th Cir. 1975). And "[b]ecause impeachment evidence is not offered for the truth of the matter asserted, it is not hearsay." *Limbeya v. Holder*, 764 F.3d 894, 898 (8th Cir. 2014) (citing Fed. R. Evid. 801(c)). This means "[e]vidence showing a witness's bias is almost always admissible." *United States v. Chambers*, 133 F.4th 812, 816 (8th Cir. 2025) (quoting *United States v. Harris*, 956 F.2d 177, 181 (8th Cir. 1992)).

Etue's statements during the preparation session were admissible and highly probative of Etue's bias toward the government and against Agbaje. Under the government's theory, Agbaje used Etue as an unwitting pawn in his fraudulent scheme, and Etue's statements support an inference that he was shocked by that possibility. In explaining its theory and interpreting evidence that Etue had not seen before, the government provided Etue with a clear path to exonerate himself by blaming Agbaje in a manner consistent with the government's theory. Etue's statements also imply his realization that Agbaje used him, supplying a motive for Etue to turn the tables by testifying for the government. The statements went beyond implying Etue's generalized bias from his extraordinarily favorable cooperation agreement. Rather, they would have given teeth to the implication of bias by revealing Etue's view that the government had given him "exactly what [he] needed" to help prove that Agbaje — the "idiot" who had "put [him] through this" — was the one who "need[ed] to be caught."

The district court did not admit the statements because it did not view the government's preparation of Etue as ethically improper. *See Geders v. United States*, 425 U.S. 80, 90 n.3, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) ("An attorney must respect the important ethical distinction between discussing testimony and seeking improperly to influence it."). But the ethical propriety of the preparation session is beside the point here, and we express no view on the issue other than to observe its irrelevance to the question of admissibility. Regardless of its propriety, the government's exchange with Etue was admissible as extrinsic evidence, *Johnson*, 521 F.2d at 562 & n.13, because it was probative of Etue's bias and "[t]he partiality of a witness ... is 'always relevant ....' " *Id. at 561* (quoting *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). [2]

[2] Agbaje also argues the district court violated the Confrontation Clause by prohibiting cross-examination about Etue's preparation session statements because it viewed the preparation as proper. Agbaje never explicitly raised a Confrontation Clause objection before the district court, and we need not consider this issue because we conclude the statements were admissible and their exclusion was not harmless. Because we are remanding, however, we observe that regardless of its propriety, the government's preparation — and alleged coaching — of Etue "is a proper subject of impeachment in cross-examination." *United States v. Carrillo*, 16 F.3d 1046, 1050 (9th Cir. 1994) (citing *Geders*, 425 U.S. at 88–90, 96 S.Ct. 1330); *see, e.g., United States v. Murdock*, 928 F.2d 293, 298 (8th Cir. 1991); *United States v. Clayton*, 787 F.3d 929, 934 (8th Cir. 2015) (citing *United States v. Nambo-Barajas*, 338 F.3d 956, 962–63 (8th Cir. 2003)).

**\*4** Moreover, excluding the statements was not harmless. While the government introduced other documentary evidence tending to show Agbaje's guilt, Etue's testimony provided an important link between Agbaje and the North Dakota fraud scheme. As Agbaje's alleged accomplice, Etue testified that Agbaje told him to expect the wire transfer from the North Dakota law firm and to send most of the money to the Danish Aller Aqua account. The split verdict on the mail and wire fraud counts — acquitting Agbaje of the substantive offenses but convicting him of aiding and abetting — suggests the jury relied on Etue's testimony to infer Agbaje was involved in the North Dakota fraud scheme because he knew the origin of the funds received by Etue. [3] If anything, the jury may have been left with a favorable impression of Etue's credibility because any motive to lie would have favored Agbaje, his close friend, rather than the government. Since Etue's testimony and credibility were key to proving the government's case, we cannot say "with fair assurance"

Appellate Case: 24-3453 Page: 20 Date Filed: 06/02/2026 Entry ID: 5646891

that excluding highly probative evidence of Etue's bias had no more than a slight influence on the verdict. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

3      For the same reason, we conclude that the evidence presented was sufficient for a reasonable jury to find Agbaje guilty beyond a reasonable doubt of aiding and abetting mail and wire fraud. *See United States v. Has No Horse*, 11 F.3d 104, 106 (8th Cir. 1993) ("We address this issue only because, if the evidence [were] not sufficient to establish guilt beyond a reasonable doubt, we would reverse the conviction and would not remand the case for a new trial.").

### III. Conclusion

Thus, we reverse Agbaje's convictions and remand for a new trial.

### All Citations

--- F.4th ----, 2026 WL 1325138

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

## <u>**Certificate of Service**</u>

Undersigned counsel hereby certifies that this document was electronically filed by using the CM/ECF system for the United States Court of Appeals for the Eighth Circuit. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: June 2, 2026          By: *s/ Caitlinrose Fisher*
                                     Caitlinrose Fisher (#398358)

                                     *Attorney for Tanesha Crump*